IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LILLIAM DAVILA-FELICIANO,

    **Plaintiffs,**

        **v.**                **CIVIL NO.** 09-1405 (FAB)

PUERTO RICO STATE INSURANCE FUND
CORPORATION, *et al.*,

    **Defendants.**

OPINION & ORDER

BESOSA, District Judge.

      Before the Court are two motions to dismiss and a motion for summary judgment filed by defendants.  (Docket Nos. 21, 34, & 81.)  Having considered the motion for summary judgment, plaintiff's opposition, and defendants' reply the Court **GRANTS** the motion for summary judgment, (Docket No. 81), thus making the motions to dismiss **MOOT**, (Docket No. 21 & 34.)

I.    **Background**

    A.    **Procedural Background**

      On May 4, 2009, plaintiff Lilliam Davila-Feliciano ("Davila") filed a complaint against the Puerto Rico State Insurance Fund Corporation ("SIF"), Carlos Ruiz-Nazario ("Ruiz"), Ariel Acosta-Jusino ("Acosta"), and Luis A. Villahermosa-Martinez ("Villahermosa").  (Docket No. 1 at ¶¶ 2.1-2.7.)  The complaint alleges discrimination and retaliation claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-15, the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1), 42 U.S.C. § 1983 ("section 1983"), Puerto Rico Law 100 ("Law 100"),

P.R. Laws Ann. tit. 29, §§ 146-51, and Puerto Rico Law 69
("Law 69"), 29 P.R. Laws Ann. tit. 29, §§ 1321-1341. Id. at ¶¶
5.1-9.5.

On September 17, 2009, Ruiz, Acosta, and Villahermosa
filed a motion to dismiss in their personal capacities. (Docket
No. 21.) This first motion to dismiss argues: (1) that Davila's
claims are barred by the applicable statutes of limitations;
(2) that Davila has failed to allege a *prima facie* case of
political discrimination pursuant to section 1983; (3) that Title
VII does not provide liability for individual defendants; and
(4) that Davila has failed to allege a cognizable retaliation
claim. Id. On October 23, 2009, the SIF, as well as Ruiz, Acosta,
and Villahermosa in their official capacities, filed a second
motion to dismiss reiterating the arguments contained in the first
motion to dismiss and further arguing: (1) that Davila has failed
to allege that she and defendants belonged to different political
parties or factions sufficient to maintain a claim of political
discrimination pursuant to section 1983; (2) that Davila failed to
allege any specific political discrimination claims against the
individual co-defendants; (3) that the SIF is not vicariously
liable for any alleged political discrimination pursuant to
section 1983; (4) that the discriminatory actions alleged Davila
were not performed under color of state law; (5) that Davila's
claims under Title VII and the EPA are barred by the applicable
statute of limitations; and (6) that Davila has not made sufficient

factual allegations to maintain a claim pursuant to the EPA.
(Docket No. 34.)

On November 24, 209, Davila filed an opposition to both
motions to dismiss. (Docket No. 49.) In this opposition, Davila
concedes that there is no individual liability for Ruiz, Acosta,
and Villahermosa under Title VII, or any vicarious liability for
the SIF under section 1983. (Docket No. 49 at 2-3.) Davila
further argues: (1) that her claims under Title VII, the EPA, and
section 1983 are not time barred because all actions alleged in the
complaint are a "pattern of conduct" giving rise to a hostile work
environment; and (2) that the allegations in the complaint are
sufficient to maintain Davila's retaliation, EPA, and political
discrimination claims. (Docket No. 49.) On December 8, 2009,
defendants filed a reply to Davila's opposition. (Docket No. 57.)

On September 10, 2010, defendants filed a motion for
summary judgment arguing: (1) that Davila's claims are barred by
the applicable statutes of limitations; (2) that Davila has failed
to establish a *prima facie* case of gender discrimination pursuant
to Title VII; (3) that Davila has failed to establish a retaliation
claim pursuant to Title VII; (4) that Davila has failed to
establish a *prima facie* case of political discrimination pursuant
to section 1983; and (5) that Davila has failed to present any
comparative evidence regarding the qualifications or conditions of
her position and other positions at the SIF sufficient to maintain
an EPA claim. (Docket No. 81.) On October 11, 2010, Davila filed
an opposition to the motion for summary judgment arguing that her

claims are not time barred and that she has presented sufficient evidence to support those claims for the purposes of surviving summary judgment.  (Docket No. 99.)

**B.   Plaintiff's Failure to Comply with Local Rule 56(c)**

The First Circuit has "repeatedly . . . emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]."  <u>Caban Hernández v. Phillip Morris USA, Inc.</u>, 486 F.3d 1, 7 (1st Cir. 2007).  Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is - and what is not - genuinely controverted.'"  <u>Id.</u> (quoting <u>Calvi v. Knox County</u>, 470 F.3d 422, 427 (1st Cir. 2006)).  Due to the importance of this function to the summary judgment process, "litigants ignore [such rules] at their peril." <u>Id.</u>

Where a party does not act in compliance with Local Rule 56, "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated."  <u>Id.</u> (citing <u>Cosme-Rosado v. Serrano-Rodríquez</u>, 360 F.3d 42, 45 (1st Cir. 2004)).  Local Rule 56(c) requires a non-moving party to file with its opposition "a separate, short, and concise statement of material facts" which shall "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule."  Local Rule 56(c) also requires that, if the nonmoving party includes any additional facts, such facts must

be in a separate section, set forth in separate numbered paragraphs, and be supported by a record citation.

Davila fails to comply with Local Rule 56(c) on numerous occasions in her response to defendants' statement of uncontested facts.  (See Docket No. 99-1.)  In some instances, Davila simply fails to provide any record citation for her denial or qualification of defendants' assertions of fact.  See, e.g., id. at ¶¶ 16-22, 25-30.  In others, Davila responds to an assertion of fact with no record citation, and then continues to list several of her own additional facts also without record citation.  See, e.g., id. at ¶¶ 33, 37, 40, 42-43, 59-63.  The Court will not credit any response to defendants' assertions of fact that does not comply with Local Rule 56(c).  Any assertion of fact which is not properly denied or qualified shall be **DEEMED ADMITTED** in the following factual background.

    **C.   Uncontested Facts**

        **1.   Gender Discrimination Claim**

During all periods relevant to this case, the SIF has maintained a policy that proscribes discrimination based on an employee's race, color, religion, age, sex, disability, or any other illegal motive in the workplace, as well as a procedure for filing grievances.  (Docket No. 81-1 at ¶ 1; Docket No. 99-1 at ¶ 1; Docket No. 81-2 at ¶ 5.)  These policies are contained in the SIF's Employee Manual and corresponding Administrative Orders.  Id.  Davila was aware of this policy and the procedure for filing grievances throughout her employment at the SIF.  (Docket No. 81-1

at ¶ 2; Docket No. 99-1 at ¶ 2; Docket No. 85-13 at 86.)   During all periods relevant to the allegations in the complaint, Davila was employed as an Administrative Officer in the Corporate Security Area ("CSA") of the SIF.  (Docket No. 81-1 at ¶ 3; Docket No. 99-1 at ¶ 3; Docket No. 85-13 at 27-30.)

Davila continues to be employed by the SIF.  Id. During her tenure as an Administrative Officer, Davila has not been admonished, suspended, terminated, or demoted.  (Docket No. 81-1 at ¶ 4; Docket No. 99-1 at ¶ 4; Docket No. 81-18 at ¶ 23; Docket No. 85-13 at 81, 180-82, 186.)   She has consistently received performance appraisal reviews rating her performance as satisfactory or higher and received at least sixteen salary increases.  Id.  During this period her benefits were never reduced, her salary was never decreased, and her duties or responsibilities were never eliminated.  Id.

In 2002, Nicolas Lopez-Peña ("Lopez"), the Administrator of the SIF at that time, designated Jorge Malave ("Malave") as the Director of the CSA.  (Docket No. 81-1 at ¶ 5; Docket No. 99-1 at ¶ 5; Docket No. 81-18 at ¶ 2.)  Malave held this position until his retirement from the SIF on December 31, 2008. Id.  On August 26, 2002, Lopez and Malave designated Davila, at that time a secretary, as Administrative Officer I on an interim basis.  (Docket No. 81-1 at ¶ 7; Docket No. 99-1 at ¶ 7; Docket No. 81-18 at ¶ 7.)   On October 13, 2003, Lopez made that designation permanent. (Docket No. 81-1 at ¶ 8; Docket No. 99-1 at ¶ 8; Docket No. 81-18 at ¶ 7.)

In 2003, Davila participated in the recruitment of eleven Corporate Security Officers ("CSC's"), ten of which were male, and other employees assigned to the CSA. (Docket No. 81-1 at ¶ 9; Docket No. 99-1 at ¶ 9; Docket No. 81-18 at ¶ 4; Docket No. 85-13 at 67-68.)  Each of these CSC's would be in charge of all security-related aspects of the SIF's eleven regions.  Id.  Those regions are San Juan, Caguas, Humacao, Carolina, Bayamon, Ponce, Mayaguez, Arecibo, Aguadilla, Industrial Hospital, and the Central office located in San Juan.  Id.  During his employment at the SIF, Malave was the direct supervisor of the CSC's.  (Docket No. 81-1 at ¶ 13; Docket No. 99-1 at ¶ 13; Docket No. 81-18 at ¶ 2.)  In that capacity, Malave evaluated their performance, recommended their salary increases, disciplined them, and had authority to recommend their recruitment and termination.  Id.  In addition to obtaining a salary increase every time she was reclassified and promoted from Administrative Officer I, to Administrative Officer II, and to Administrative Officer III, Davila received a total of sixteen salary increases from July 2002 to July 2008, that were either specifically approved and signed by Villahermosa as either the Human Resources Director or the Human Resources Deputy Director ("Sub-director") or by his designated representative.  (Docket No. 81-1 at ¶ 15; Docket No. 99-1 at ¶ 15; Docket No. 81-2 at ¶ 10; Docket No. 85-13 at 80; Docket No. 85-14.)

On August 16, 2006, Ruiz implemented a Classification and Retribution Plan ("Plan"), by which the SIF would be evaluating the duties, responsibilities, and compensation

of all career and trust managerial positions.  (Docket No. 81-1 at ¶ 16; Docket No. 99-1 at ¶ 16; Docket No. 81-2 at ¶ 16; Docket No. 85-8.)  The purpose of the Plan was to ensure that each managerial employee was in fact performing their positions' duties and responsibilities and to consider whether the managerial employee was being compensated correctly according to their actual duties and responsibilities.  (Docket No. 81-1 at ¶ 17; Docket No. 99-1 at ¶ 17; Docket No. 81-2 at ¶ 16; Docket No. 85-8.)  A memorandum was circulated to all career and trust managerial employees informing them of the implementation of the Plan as of August 21, 2006.  (Docket No. 81-1 at ¶ 18; Docket No. 99-1 at ¶ 18; Docket No. 81-2 at ¶ 16; Docket No. 85-8.)  Further, the memorandum informed that, as a result of the implementation of the Plan, the Human Resources Area and the Classification and Retribution Office were not going to receive or consider any requests for Study Reclassifications of the managerial personnel. (Docket No. 81-1 at ¶ 19; Docket No. 99-1 at ¶ 19; Docket No. 81-2 at ¶ 16; Docket No. 85-8.)  Pursuant to the memorandum, the only reclassification requests that would be received and considered were Norm Reclassifications.  (Docket No. 81-1 at ¶ 20; Docket No. 99-1 at ¶ 20; Docket No. 81-2 at ¶¶ 16, 18; Docket No. 85-8.) Study Reclassifications are presented by SIF employees when they understand that a modification in their position's duties and responsibilities merit a reclassification or reevaluation of their position and, in some instances, a promotion.  (Docket No. 81-1 at ¶ 21; Docket No. 99-1 at ¶ 21; Docket No. 81-2 at ¶ 12.)

On September 25, 2006, at 9:00 a.m., Davila attended an employee meeting during which the Plan was explained. (Docket No. 81-1 at ¶ 22; Docket No. 99-1 at ¶ 22; Docket No. 81-2 at ¶¶ 12, 17; Docket No. 85-9.)  In that meeting, employees were notified that Study Reclassification requests would not be received or considered as of August 21, 2006.  Id.

According to Davila, four out of the eleven CSC's responsible for creating her alleged hostile work environment are Antonio Claudio ("Claudio"), Yamir Perez ("Perez"), Raul Jimenez ("Jimenez"), and Gerardo Cruz ("Cruz"). (Docket No. 81-1 at ¶ 24; Docket No. 99-1 at ¶ 24; Docket No. 81-2 at 251; Docket No. 85-15.) Those CSC's presented complaints before the SIF's Labor Relations Department, with the SIF's Deputy Administrator and the SIF Administrator, alleging that Davila was supervising the subcontracted security guards. (Docket No. 81-1 at ¶ 25; Docket No. 99-1 at ¶ 25; Docket No. 81-18 at ¶¶ 16-17; Docket No. 85-13 at 92-93.)  In these complaints, the CSC's contend that the supervision of the subcontracted security guards was part of their duties and responsibilities, not Davila's.  Id.

Davila was aware of these complaints, the ensuing investigation, and the perspectives of several SIF offices regarding these complaints because she had access to and read all communications transmitted between Malave, the Labor Relations Division, Human Resources, and the SIF Administrator and Deputy Administrator regarding the complaints. (Docket No. 81-1 at ¶ 26; Docket No. 99-1 at ¶ 26; Docket No. 85-13 at 92-93, 173-75.)  From

reading those communications, Davila learned that during the years 2004, 2005, and 2006, some CSC's felt that Malave was delegating their duties to Davila.  (Docket No. 81-1 at ¶ 27; Docket No. 99-1 at ¶ 27; Docket No. 81-18 at ¶¶ 16-17; Docket No. 85-13 at 91; Docket No. 85-46 at 27-28.)   In those communications, it appears that the CSC's felt that Davila was indirectly supervising them when she visited the regions to inspect compliance with the subcontractor's security contracts.   (Docket No. 81-1 at ¶ 28; Docket No. 99-1 at ¶ 28; Docket No. 85-13 at 92-94; Docket No. 85-46 at 32-33.)   After those visits, Davila pointed out to Malave certain issues or irregularities she witnessed during her visit to the regions that could have eventually affected the CSC's.   Id. The communications indicate that the CSC's resented that because they thought that Davila had no supervisory authority over the CSC's.  Id.

         The communications also indicate that some CSC's commented to other CSC's that they resented the fact that Davila lacked the required academic background or expertise to intervene in certain aspects related to their positions' functions or to perform the tasks that their positions entailed.  (Docket No. 81-1 at ¶ 29; Docket No. 99-1 at ¶ 29; Docket No. 85-13 at 128, 191.) The communications further indicate that the CSC's alleged in a judicial complaint presented before the Puerto Rico courts that Malave favored Davila and delegated his supervisory functions to her because of her gender.  (Docket No. 81-1 at ¶ 30; Docket No. 99-1 at ¶ 30; Docket No. 85-13 at 110, 128-29, 199-200, 219.)

Upon learning of the CSC's complaints and communications, Davila felt discriminated against because of her gender. (Docket No. 81-1 at ¶ 31; Docket No. 99-1 at ¶ 31; Docket No. 85-13 at 91-93, 128.)

In March of 2005, the CSC's had a meeting with Acosta. (Docket No. 81-1 at ¶ 34; Docket No. 99-1 at ¶ 34; Docket No. 85-13 at 186-87; Docket No. 85-47 at 29-36.) Davila was not present at that meeting. (Docket No. 81-1 at ¶ 35; Docket No. 99-1 at ¶ 35; Docket No. 85-13 at 186.) On October 16, 2006, Claudio, Perez, Jimenez, Cruz, and Burgos filed a judicial complaint against the SIF, Ruiz, Malave, Carreras, and Acosta in the Puerto Rico Court of First Instance in San Juan. (Docket No. 81-1 at ¶ 38; Docket No. 99-1 at ¶ 38; Docket No. 85-48; Docket No. 85-49.) The complaint was later amended on October 8, 2007, to remove Burgos as a plaintiff. Id. Davila is not a party to that case. (Docket No. 81-1 at ¶ 39; Docket No. 99-1 at ¶ 39; Docket No. 85-48; Docket No. 85-49.) In that complaint, the CSC's listed above allege gender discrimination based on the averment that, among other things, Malave had been assigning the CSC's duties and responsibilities to Davila because of her gender. (Docket No. 81-1 at ¶ 40; Docket No. 99-1 at ¶ 40; Docket No. 85-48; Docket No. 85-49.) Davila has admitted that the CSC's had no power to alter the conditions of her position with regard to promotions, reclassification requests, salary increases, benefits, or evaluations. (Docket No. 81-1 at ¶ 41; Docket No. 99-1 at ¶ 41; Docket No. 85-13 at 191-92.) On October 5, 2005, Davila sent a letter to the Management Employees Federation notifying them of the

situations she was allegedly confronting at work.  (Docket No. 81-1
at ¶ 42; Docket No. 99-1 at ¶ 42; Docket No. 85-15 at 15.)   On
December 8, 2006, Davila filed a complaint with the Labor Relations
Division of the SIF, alleging a pattern of gender and political
discrimination perpetrated by several CSC's and supervisors within
the SIF.  (Docket No. 81-1 at ¶ 43; Docket No. 99-1 at ¶ 43; Docket
No. 81-2 at ¶ 19; Docket No. 85-10; Docket No. 85-15.)[1]   The
alleged pattern of discrimination largely involved the CSC's
complaints about Davila and interference with Davila's duties and
responsibilities, which Davila claimed negatively affected her
health.  Id.  On December 13, 2006, Ruiz sent a communication to
the Labor Relations Director, directing him to conduct the
corresponding investigation.  (Docket No. 81-1 at ¶ 44; Docket
No. 99-1 at ¶ 44; Docket No.81-2 at ¶ 20; Docket No. 85-11.)   On
February 4, 2008, Davila filed an administrative charge before the
Puerto Rico Antidiscrimination Unit.  (Docket No. 81-1 at ¶ 23;
Docket No. 99-1 at ¶ 23; Docket No. 85-13 at 113; Docket No. 85-
15.)

            2.    **Political Discrimination Claim**

            At all times relevant to this case, Davila, Malave,
and the individual defendants in this case were affiliated with the
Popular Democratic Party ("PDP").  (Docket No. 81-1 at ¶¶ 45-46;
Docket No. 99-1 at ¶¶ 45-46; Docket No. 85-13 at 97; Docket No. 85-

---

[1] The parties disagree as to the exact allegations of this
complaint, but seem to agree as to its basic nature and the fact
that it was filed.

47 at 25; Docket No. 85-50 at 11-12.)   In 2004, Villahermosa ran

for president of a group that represents SIF employees affiliated

with the PDP.  (Docket No. 81-1 at ¶ 49; Docket No. 99-1 at ¶¶ 49;

Docket No. 85-13 at 100.)   Davila never had a conversation with

Villahermosa regarding politics or political ideologies.  (Docket

No. 81-1 at ¶ 50; Docket No. 99-1 at ¶ 50; Docket No. 81-2 at ¶ 23;

Docket No. 85-13 at 101.)    Davila  knew  of  Ruiz's  political

affiliation  with  the  PDP  because  he  was  designated  as  SIF

Administrator by former Governor and PDP President, Anibal Acevedo-

Vila, and because she had seen him at PDP activities.  (Docket

No. 81-1 at ¶ 51; Docket No. 99-1 at ¶ 51; Docket No. 85-13

at 102.)   Davila never had a conversation with Ruiz regarding

politics or work, and does not know whether Ruiz is aware of her

political affiliation.  (Docket No. 81-1 at ¶ 52; Docket No. 99-1

at ¶ 52; Docket No. 85-13 at 103.)

        Davila knew of Acosta's affiliation with the PDP

because of his attendance at PDP activities.  (Docket No. 81-1 at

¶ 53; Docket No. 99-1 at ¶ 53; Docket No. 85-13 at 103-04.)  Davila

never had a conversation with Acosta regarding politics.  (Docket

No. 81-1 at ¶ 54; Docket No. 99-1 at ¶ 54; Docket No. 85-13 at

104.)  The CSC's referred to above were also affiliated with the

PDP at all times relevant to this case.  (Docket No. 81-1 at ¶ 55;

Docket No. 99-1 at ¶ 55; Docket No. 118-1 at 47; Docket No. 85-13

at 159-161.)

        The  first  time  that  Davila  alleged  political

discrimination was in her administrative charge before the Puerto

Rico Anti-discrimination Unit on February 4, 2008. (Docket No. 81-1 at ¶ 56; Docket No. 99-1 at ¶ 56; Docket No. 85-13 at 106; Docket No. 85-15.)  She did not allege political discrimination in her internal complaint before the SIF.  Id.

Davila bases her political discrimination allegations on an internal political election conducted in February of 2004 to elect the President of a group that represents SIF employees affiliated with the PDP. (Docket No. 81-1 at ¶ 57; Docket No. 99-1 at ¶ 57; Docket No. 85-13 at 122.)  Villahermosa was one of the candidates for this position. (Docket No. 81-1 at ¶ 58; Docket No. 99-1 at ¶ 58; Docket No. 85-13 at 237.)  Davila supported another candidate for that position, Jose Ortiz ("Ortiz"). (Docket No. 81-1 at ¶ 59; Docket No. 99-1 at ¶ 59; Docket No. 81-2 at ¶ 22; Docket No. 85-13 at 122, 159-61.)  Villahermosa ultimately won the election. (Docket No. 81-1 at ¶ 60; Docket No. 99-1 at ¶ 60; Docket No. 81-2 at ¶ 22.)

Pursuant to a stipulation that had been signed on January 16, 1996, between the SIF and the Management Employees Federation related to the Classification and Retribution Plan of the managerial employees, the Administrative Officer position could only be subject to a Norm Reclassification up until level III and to higher levels by means of a Study Reclassification from level III onwards. (Docket No. 81-1 at ¶ 64; Docket No. 99-1 at ¶ 64; Docket No. 81-2 at ¶ 13; Docket No. 81-18 at ¶ 15.)

On April 24, 2005, Acosta visited Davila's office and inquired as to Davila's reasons for reversing a direct order

that he had given to Cruz, the Bayamon CSC.  (Docket No. 81-1 at
¶ 71; Docket No. 99-1 at ¶ 71; Docket No. 85-13 at 133, 183-186;
Docket No. 85-47 at 52-65.)   The order reversed pertained to
emergency preventive measures related to a mercury spill in the
region.  Id.  Davila claims that Acosta's visit was motivated by
her political affiliation on the sole basis that it occurred after
the February 2004 elections during which she supported Ortiz rather
than Villahermosa.  (Docket No. 81-1 at ¶ 72; Docket No. 99-1
at ¶ 72; Docket No. 85-13 at 188-89.)

        An exchange of interdepartmental communications is
customary when an employee files an internal complaint.  (Docket
No. 81-1 at ¶ 74; Docket No. 99-1 at ¶ 74; Docket No. 85-13 at 173-
74.)   Davila has admitted that no reference was made to her
political   affiliation   in   the   internal   interdepartmental
communications she read.  (Docket No. 81-1 at ¶ 75; Docket No. 99-1
at ¶ 75; Docket No. 85-13 at 175.)

        On  November  7,  2005,  Villahermosa  addressed  a
memorandum to William Carreras-Irizarry, Director of the Labor
Relations  and  Equality  in  Employment  Area.   (Docket  No.  99-1
at ¶ 84; Docket No. 118-1 at 71; Docket No. 113-4.)   That
memorandum indicates that it responds to a request from Carreras-
Irizarry for the description of the duties of Davila's position as
Administrative Officer I in the CSA.  (Docket No. 99-1 at ¶ 85;
Docket No. 118-1 at 71; Docket No. 113-4.)  Villahermosa informed
Carreras  that  a  study  had  been  conducted  regarding  Davila's
position, concluding that the duties of that position were "of an

administrative assistant capacity" and did not include any
supervisory duties.  (Docket No. 99-1 at ¶ 86; Docket No. 118-1
at 71; Docket No. 113-4.)  On November 21, 2008, Villahermosa wrote
another memorandum regarding Davila's duties and responsibilities
at the request of Attorney Hilda Colon-Navarro ("Colon"), Director
of the Labor Relations and Equality in Employment Area.  (Docket
No. 99-1 at ¶ 89; Docket No. 118-1 at 72; Docket No. 113-5.)

### 3.   Equal Pay Act Claim

Davila admits that she does not have the academic
credentials or work-related experience to qualify for the CSC
position.  (Docket No. 81-1 at ¶ 81; Docket No. 99-1 at ¶ 81;
Docket No. 85-13 at 73-75.)  All of the CSC's were qualified for
the CSC position when they were selected for the position.  (Docket
No. 81-1 at ¶ 82; Docket No. 99-1 at ¶ 82; Docket No. 85-13 at 74.)
The CSC's duties and functions include the supervision,
coordination, and implementation of the norms, measures, and
security controls necessary to protect the life of the employees
and visitors as well as the property and equipment of the SIF.
(Docket No. 81-1 at ¶ 83; Docket No. 99-1 at ¶ 83; Docket No. 81-18
at ¶ 5; Docket No. 85-13 at 74-75.)  The CSC's also supervise and
assign the investigation of complaints and reports involving
damages to the property of the SIF and acts of violence that
involve employees, visitors, or the general public.  Id.

## II.  Discussion

### A.   Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  The rule states, in pertinent part, that a court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the Court's denial of the motion for summary judgment.  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l., Inc., 229 F.3d 49, 53 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  Material means that a contested fact has the

potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Id. at 252. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

**B.   Statutes of Limitations**

Defendants argue that Davila's claims pursuant to Title VII and section 1983 are barred by their respective statutes of limitations. (Docket No. 81 at 14-16.) Reading Davila's opposition generously, she offers two theories to escape the effect of those limitations period. (See Docket No. 99 at 12-16.) First, Davila claims that the discriminatory conduct based on her gender constituted a single hostile work environment, thus making her

claims timely so long as one part of the alleged hostile work environment falls within the statute of limitations.  Id.  Second, Davila argues that the discriminatory conduct based on her political affiliation constituted a pattern of similar political discrimination.  Id.  The Court addresses each theory in turn.

### 1.   Hostile Work Environment under Title VII

With regard to plaintiff's Title VII claims, defendants claim that because Davila filed her administrative charge on February 4, 2008, any claim arising from discriminatory acts prior to June 7, 2007, are time barred.  (Docket No. 118 at 2.)[2]  Davila responds by arguing that because her claims are based upon an alleged hostile work environment, any discriminatory conduct occurring outside of the statutory limitations period may be anchored to conduct within that period.  (Docket No. 99 at 12-14.)  Davila specifically identifies that anchoring conduct as a complaint made on February 9, 2009, by Claudio to the newly appointed Director of the Corporate Security Area, Pedro Cortes-Peña ("Cortes").  Id. at 16.

"The Supreme Court has distinguished between claims involving discrete incidents of discrimination and retaliation from hostile work environment claims."  Ruiz-Sulsona v. University of P.R., 334 F.3d 157, 160 (1st Cir. 2003) (citing Nat'l. R.R.

---

[2] "A plaintiff who brings a hostile work environment claim under Title VII must file her claim within 300 days of an act of discrimination, and in general cannot litigate claims based on conduct falling outside of that period."  O'Rourke v. City of Providence, 713, 730 (1st Cir. 2001) (citing Provencher, 145 F.3d at 13).

Passenger Corp. v. Morgan, 536 U.S. 101, 110-16 (2002)).  "'Hostile work environment claims do not turn on single acts but on an aggregation of hostile acts extending over a period of time.'"  Id. (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002)).  "Consequently, the statute of limitations 'will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period.'"  Id. (quoting Dressler v. Daniel, 315 F.3d 75, 79 (1st Cir. 2003)).

In order to take advantage of the continuing violation doctrine in this context and avoid the effect of the statute of limitations, "[h]owever, the plaintiff must still show that 'the employer has engaged in enough activity to make out an actionable hostile environment claim.'"  Malone v. Lockheed Martin Corp., No. 09-2060, 610 F.3d 16, 2010 U.S. App. LEXIS 13063, at *22 n. 12 (1st Cir. June 25, 2010) (citing Morgan, 536 U.S. at 117).  In order to establish an actionable hostile work environment claim, a plaintiff must show:  "'(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.'"  Agusty-Reyes v. Dep't. of Educ.

of P.R., 601 F.3d 45, 52-53 (1st Cir. 2010) (quoting Valentin-
Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir.
2006)).  "Because the inquiry is fact specific, the determination
is often reserved for a fact finder, but summary judgment is an
appropriate vehicle for 'polic[ing] the baseline for hostile
environment claims.'"  Pomales v. Celulares Telefonica, Inc., 447
F.3d 79, 83 (1st Cir. 2006) (quoting Mendoza v. Borden, Inc., 195
F.3d 1238, 1244 (11th Cir. 1999)) (citing Marrero v. Goya of P.R.,
Inc., 304 F.3d 7, 19 (1st Cir. 2002)) (internal citations omitted).

          As to whether she can maintain an actionable hostile
work environment claim, Davila makes no attempt to explain to the
Court why the particular facts or evidence presented support that
claim.  (See Docket No. 99.)   Instead, Davila points out that
employers may be held liable for harassment perpetrated by
coworkers and that harassment based on gender need not be sexually
charged.  See id. at 16-19.  Davila concludes by stating that "the
question thus becomes if based upon the record a jury can conclude
that Defendants' behavior towards Davila-Feliciano . . . was
triggered by her gender."  Id. at 18.  This conclusion, however,
completely glosses over the rather important question of whether a
reasonable jury could find that defendants' alleged conduct
"'permeated [Davila's workplace] with discriminatory intimidation,
ridicule, and insult that [is] sufficiently severe or pervasive so
as to alter the conditions of . . . [Davila's] employment and
create an abusive working environment.'"  See Quiles-Quiles v.
Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (quoting Harris v.

Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Based on the record

on summary judgment in this case, the Court must agree with

defendants that the Davila cannot establish the requisite severity

or pervasiveness to maintain a hostile work environment claim.

         Davila points to no evidence on the record

demonstrating severity or pervasiveness with regard to the alleged

conduct of any of the defendants.  (See Docket No. 99.)  Nor does

she specifically identify the conduct she contends formed a hostile

work environment for the purposes of her Title VII claim.  See id.

at 18.  Davila only generally alludes to "the CSCs, Villahermosa,

Acosta-Jusino and Ruiz-Nazario's failure to act."  Id.

         Even reviewing the evidence presented by Davila,

there does not appear to be any conduct rising to the level of

severity and pervasiveness necessary to establish a hostile work

environment claim.  When considering whether alleged conduct is

severe or pervasive, courts look to:  "'the frequency of the

discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work

performance.'"  O'Rourke, 235 F.3d at 728-29 (quoting Faragher v.

City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  The most that

can be said of defendants' conduct from the evidence presented

properly by Davila is:  (1) that the CSCs wrote memoranda to

Davila's supervisor complaining about alleged interference with

their supervisory duties by Davila and stating that Davila did not

have the necessary experience or qualifications to perform those

duties; (2) that the CSCs filed a judicial complaint alleging that
Malave assigned their supervisory duties to Davila because of her
gender; and (3) that on one occasion, a CSC refused to allow Davila
to conduct a security personnel inspection.[3]  Davila makes no
attempt to explain why these incidents are sufficiently severe or
pervasive to maintain a hostile work environment claim.  (See
Docket No. 99 at 16-19.)  None of the conduct appears physically
threatening, particularly humiliating or severe and there is very
little evidence demonstrating any unreasonable interference with
Davila's performance at work.  Furthermore, the conduct gleaned
from Davila's evidence is far from that found by other courts to be
sufficiently severe and pervasive.  See, e.g., Rosario v. Dep't. of
the Army, 607 F.3d 241, 249 (1st Cir. 2010); Marrero v. Goya of
P.R., Inc., 304 F.3d 7, 19-20 (1st Cir. 2002); cf. Rigau v. Pfizer
Caribbean Corp., 525 F. Supp. 2d 272, 284 (D.P.R. 2007).
Accordingly, it is clear that no reasonable factfinder could
conclude that the evidence presented on summary judgment
demonstrates a hostile work environment.

        Having found no actionable hostile work environment
claim, the Court is left with two conclusions.  First, Davila
cannot rescue alleged discriminatory conduct prior to June 7, 2007
from the statute of limitations.  Second, any conduct not barred by
the statute of limitations is insufficient to support Davila's

---

[3] Davila refers to other incidents alleged in her internal SIF
administrative complaint, but provides no evidence regarding those
incidents with her response in opposition to the motion for summary
judgment.  (See Docket No. 118-1.)

hostile work environment claim.  Given that Davila's primary Title
VII discrimination claim and her Title VII retaliation claim are
both based on the alleged hostile work environment, (see Docket
No. 1 at ¶¶ 5.1-5.7, 8.1-8.5.), neither can survive summary
judgment.

### 2.    Political Discrimination Claim under Section 1983

Davila alleges political discrimination pursuant to
section 1983 against Villahermosa, Ruiz, and Acosta based on her
requests for reclassification of her position.  Davila bases her
section 1983 claim primarily on Villahermosa's alleged refusal to
consider "plaintiff's reiterated requests for a reclassification of
her position."[4]  This statutory provision "affords redress against
a person who, under color of state law, deprives another person of
any federal constitutional or statutory right."  Omni Behavioral
Health v. Miller, 285 F.3d 646, 650-51 (8th Cir. 2002); see also
Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 621 (1st Cir. 2000).
It is well-settled that in order for a claim to be cognizable under
section 1983, a plaintiff must plead and prove three elements:

---

[4] Although Davila makes no mention of the incident in her response
in opposition to the motion for summary judgment, (See Docket
No. 99), the evidence she presents seems to indicate that she
considers her meeting with Acosta regarding reversal of his orders
to be an example of political discrimination. (See Docket No. 99-
1).  Even if this could be considered an incident of political
discrimination, that meeting occurred well before May 4, 2008, and
Davila refers to no similar incident to anchor it within the
statute of limitations.  Furthermore, as discussed below, Davila
may not rely on the continuing violation doctrine because she
considered the alleged conduct to be discriminatory shortly after
it occurred.  See Windross v. Barton Protective Servs., Inc., 586
F.3d 98, 103 (1st Cir. 2009); Williams v. Raytheon Co., 220 F.3d
16, 21 (1st Cir. 2000).

(1) that the defendants acted under color of state law; (2) that plaintiffs were deprived of federally protected rights, privileges or immunities; and (3) that the defendants' alleged conduct was causally connected to the plaintiff's deprivation. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989).

Section 1983 does not set forth a limitations period, but instead borrows the forum state's statute of limitations for personal injury actions. Owens v. Okure, 488 U.S. 235, 240-241 (1989); Rosario Rivera v. Aqueduct and Sewer Auth. of P.R., 472 F. Supp. 2d 165, 170 (D.P.R. 2007) (citing Wilson v. García, 471 U.S. 261, 276-278 (1985); López-González v. Municipality of Comerío, 404 F.3d 548, 551 (1st Cir. 2005); Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997)). Under Puerto Rico law, the applicable limitations period for personal injury actions is one year. See P.R. Laws Ann. tit. 31, § 5298 (2006); Carreras-Rosa, 127 F.3d at 174. Accordingly, the one-year term applies for section 1983 actions in Puerto Rico. Torres v. Superintendent of the Police of P.R., 893 F.2d 404, 406 (1st Cir. 1990). "The underlying premise for the limitations period is to protect both the defendants from having to defend from distant events as well as those affected individuals who timely prosecute their claims." Del Carmen Rodríguez v. Trujillo, 507 F. Supp. 2d 131, 135 (D.P.R. 2007) (citing Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 70-71 (1st Cir. 2005); Morris v. Gov't. Dev. Bank of P.R., 27 F.3d 746, 750 (1st Cir. 1994)).

"Although the limitations period is determined by state law, the date of accrual is a federal law question." Carreras-Rosa, 127 F.3d at 174.  The accrual period "'ordinarily starts when the plaintiff knows, or has reason to know of the injury on which the action is based.'"  Id. (quoting Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 353 (1st Cir. 1992)).  Therefore, the one-year statute of limitations for actions brought under section 1983 "begins running one day after the date of accrual, which is the date plaintiff knew or had reason to know of the injury".  González García v. P.R. Elec. Power Auth., 214 F. Supp. 2d 194, 200 (D.P.R. 2002); Benítez-Pons v. Commonwealth of Puerto Rico, 136 F.3d 54, 59 (1st Cir. 1998).

Davila does not contest the limitations period, but rather argues that the continuing violation doctrine precludes the straightforward application of that period because she alleges a pattern of political discrimination including conduct that falls within the statute of limitations.  Specifically, Davila argues that any alleged discriminatory conduct not within the statute of limitations is related to a September 2008 incident in which "Villahermosa 'once again intervened from his official position in the Human Resources [sic] to illegally change the responsibilities of plaintiff's position, by specifically taking away her supervisory functions and in such manner unilaterally altering the official description of plaintiff's duties.'"  (Docket No. 99 at 15.)

It is true that "the continuing violation doctrine
has been widely applied to § 1983 cases within the First Circuit."
Ayala-Sepulveda v. Municipality of San German, No. 09-1471, 2010 WL
2991422 (D.P.R. Aug. 2, 2010) (citing Ruiz Casillas v. Camacho
Morales, 2004 WL 3622480, at *5 (D.P.R. 2004)).  Villahermosa's
alleged refusals to consider Davila's reclassification requests,
however, are clearly discrete acts, not components of a hostile
work environment.  From the evidence on the record, the requests
for reclassification appear to be essentially a failure to promote,
because the successful result of such a request is the assignment
of different responsibilities and a corresponding increase in pay.
(See Docket No. 81-1; Docket No. 99-1.)  A failure to promote is a
prototypical discrete discriminatory action and, for that reason,
Davila's    allegations    regarding    ignored    requests    for
reclassification are each independently subject to the year-long
statute of limitations period for section 1983 claims.  See Ruiz-
Sulsona, 334 F.3d at 160 (citing Morgan, 536 U.S. at 110-16).

Even if the alleged refusals to consider Davila's
reclassification requests could be considered a pattern of
discrimination for the purposes of the continuing violation
doctrine, that doctrine is only available where a plaintiff was
unaware of the discriminatory nature of otherwise time-barred
conduct at the time that it occurred.  See Windross, 586 F.3d at
103; Williams, 220 F.3d at 21.  It is clear that Davila considered
Villahermosa's alleged conduct with regard to her reclassification
requests to be discriminatory, because she described that conduct

as political discrimination in her ADU complaint on February 4, 2008. (See Docket No. 81-1 at ¶ 56; Docket No. 85-15.) Accordingly, Davila may not take advantage of the continuing violation doctrine and any claims based on discrete acts related to her reclassification requests occurring prior to May 4, 2008, are barred by the statute of limitations applicable to section 1983.

### C. Political Discrimination

The only remaining allegation related to political discrimination is Davila's claim that Villahermosa somehow intervened to alter her job description or responsibilities in September, 2008. (See Docket No. 1 at ¶ ; Docket No. 99.) Claims alleging political discrimination in employment pursuant to section 1983 seek to vindicate the First Amendment right to freedom of speech and association, which provides non-policymaking public employees with protection from adverse employment decisions based on their political affiliation. Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000); see also Rutan v. Republican Party, 497 U.S. 62, 75 (1990); Branti v. Finkel, 445 U.S. 507, 516 (1980); Elrod v. Burns, 427 U.S. 347, 354 (1976). A plaintiff alleging political discrimination bears the threshold burden of producing sufficient evidence, whether direct or circumstantial, that he or she engaged in constitutionally protected conduct and that political affiliation was a substantial or motivating factor behind the challenged employment action. Gonzalez-Blasini v. Family Dept., 377 F.3d 81, 85 (1st Cir. 2004); Rodriguez-Rios v. Cordero, 138 F.3d 22, 24 (1st Cir. 1998). "The

plaintiff must point to evidence on the record which, if credited, would permit a rational fact-finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus." Gonzalez-Blasini, 377 F.3d at 85 (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996)).

Davila has completely failed to present properly, or even identify, any evidence that Villahermosa's memorandum was motivated by political animus. (See Docket No. 99 at 19-21; Docket No. 99-1.) Without that evidence, Davila cannot establish a *prima facie* case of political discrimination. See Gonzalez-Blasini, 377 F.3d at 85. Accordingly, Davila's only timely political discrimination claim cannot survive summary judgment.

**D.   EPA Claim**

Although Davila includes an EPA claim in the complaint with regard to an alleged disparity in pay between her own position and that of the CSC's, she makes no attempt to support her EPA claim. (See Docket No. 99.) In order to maintain a claim under the EPA, Davila "must first establish a prima facie case by showing that the employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort and responsibility." Ingram v. Brink's, Inc., 414 F.3d 222, 232 (1st Cir. 2005) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974)). Davila points to no comparative evidence to establish a disparity in the wages of her position and that of the CSC's. (See Docket No. 99.)

Furthermore, in considering whether jobs are of equal skill, "[s]kill includes consideration of such factors as experience, training, education, and ability . . . measured in terms of the performance requirements of the job." 29 C.F.R. § 1620.15(a).   It is an uncontested fact that the CSC position requires a degree in Criminal Justice or Criminology from a recognized university or college, two years of experience in work related to the protection of life, property and equipment which included supervisory responsibilities, or a bachelor's degree from a recognized from a recognized college or university and three years of experience in work related to the protection of life, property and equipment which included supervisory functions. (See Docket No. 81-1 at ¶ 80; Docket No. 99-1 at ¶ 80; Docket No. 118 at 71.)  Davila recognizes that all of the CSC's referred to in the complaint possessed those qualifications and that she does not possess those qualifications. (See Docket No. 81-1 at ¶ 81-82; Docket No. 99-1 at ¶ 81-82; Docket No. 118 at 71.)  Given the lack of evidence presented by Davila and her admission that she does not possess the requisite qualifications for the CSC position, the EPA claim alleged in the complaint cannot survive summary judgment.

**E.   Supplemental Claims**

Davila also alleges claims under Puerto Rico Law 100 and Law 69.  (See Docket No. 1 at ¶¶ 5.1-9.5.)  The jurisdictional basis to maintain the Law 100 and Law 69 claims in this Court has been undermined by the dismissal of Davila's federal claims.

Accordingly, those supplemental claims are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).

## III. Conclusion

For the reasons stated above, the Court **GRANTS** the motion for summary judgment, (Docket No. 81).  Davila's federal claims are **DISMISSED WITH PREJUDICE.**  Davila's supplemental claims under Puerto Rico law are **DISMISSED WITHOUT PREJUDICE.**  Given the dismissal of all claims in this case, the motions to dismiss, (Docket Nos. 21 & 34), are **MOOT.**

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, December 6, 2010.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE
